UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLTON DAVENPORT, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>NVIDIA CORPORATION,<br><br>   Defendant. | Case No. 23-cv-01877-PCP<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION** |

Defendant Nvidia Corporation asserts that plaintiffs in this putative consumer class action agreed to arbitrate their claims. For the reasons that follow, the Court concludes that plaintiffs' claims are covered by an enforceable arbitration agreement. Nvidia's motion to compel arbitration is therefore granted.

**I.    Background**

According to the complaint in this putative class action, Nvidia sold a "Shield" line of devices with a feature that allowed owners to stream games from a computer to a TV at 60 frames per second in 4K resolution. Plaintiffs claim that Nvidia advertised, marketed, and sold Shield devices as including the game streaming feature, but then subsequently disabled access to this feature. They assert that this deprived them of a feature they had paid for and devalued their devices. On this basis, plaintiffs filed this putative class action with claims of trespass to chattels and breach of implied warranty of fitness for a particular purpose, as well as violations of state consumer protection laws and California's Unfair Competition Law and Consumers Legal Remedies Act. Nvidia then moved to compel arbitration under the Federal Arbitration Act, arguing that plaintiffs had agreed to resolve their claims via arbitration.

Nvidia argues that all Shield users were required to complete several mandatory steps when they first used the device after purchase. Users were presented with the following screen:



Motion, Dkt. No. 21, at 7. The screen informs users: "By continuing, you are agreeing to the NVIDIA Software Terms of Use." Users are given three options: "Agree and Continue"; "View Terms of Use"; or "View Privacy Policy." If users select "View Terms of Use," they are taken to an interface where they can view a scrollable "SHIELD Agreement" which states in relevant part:

> 10. Governing Law and Dispute Resolution. …
>
> If you have any complaint about this license or the SOFTWARE ["software, firmware, content, applications, documentation and any data that is delivered … for use in a NVIDIA SHIELD device."], please give NVIDIA a chance to resolve it and contact NVIDIA by U.S. Mail …. If NVIDIA is unable to resolve your dispute and you wish to present it to an authority for decision, you agree to resolve it according to the laws of the State of Delaware without regard to its conflict of laws rules or principles and submit the dispute to binding arbitration before an arbitrator from Judicial Mediation and Arbitration Services ("JAMS") located in Santa Clara County, California under the Optional Expedited Arbitration Procedures then in effect for JAMS. By entering this license, you agree to bring any claims in your individual capacity, and you waive the right to a trial by jury or to participate in a class action or other type of representative proceeding. If for any reason this license to arbitrate is found not to apply to a dispute and as a result a dispute proceeds in court rather than in arbitration, any dispute shall be resolved in the state or federal courts located in Santa Clara County, California.

Dkt. No. 21-1, at 3–4; Dkt. No. 21-2, at 6. According to Nvidia, users can also access this agreement from the device's settings screen after setting up their device. Nvidia says that plaintiffs were "put on notice" of the agreement to arbitrate during the setup process, and that they "could have reviewed the SHIELD Agreement and chosen to abandon the set-up process" but instead chose to "Agree and Continue." Motion at 11.

## II. Legal Standards

The Federal Arbitration Act provides that a "written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As this language makes clear, "an arbitration agreement is a contract like any other." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023). And like other contracts, arbitration agreements are subject to "generally applicable contract defenses" like "fraud, duress, or unconscionability." *Lim v. TForce Logs., LLC*, 8 F.4th 992, 999 (9th Cir. 2021). There is one way arbitration provisions in a contract are distinct, however: "[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). In other words, notwithstanding state law on severability, an arbitration provision can be valid and enforceable even if other parts of the contract it is in are not.

A purported arbitration agreement presents a few "gateway" issues: First, whether an agreement to arbitrate was actually formed. *See Ahlstrom v. DHI Mortg. Co., Ltd., L.P.*, 21 F.4th 631, 634–35 (9th Cir. 2021). Second, whether that agreement is "valid," *Bielski*, 87 F.4th at 1009, in other words, whether there are any defenses. Third, "whether the agreement encompasses the dispute at issue." *Id.* Normally, these gateway questions are resolved by a court. But parties to an arbitration provision can also enter a separate agreement to arbitrate some of these gateway questions—a "delegation" provision. "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). And, like any other arbitration provision, a delegation provision is severable. *See Buckeye*, 546 U.S. at 445. Not all gateway questions can be delegated, however. While "some 'gateway' issues…, such as issues of validity and arbitrability, can be delegated," "parties cannot delegate issues of formation." *Ahlstrom*, 21 F.4th at 634–35.

All of this means that when presented with a contract that includes both an arbitration provision and a delegation provision, a reviewing court can consider three types of challenges:

3

1  (1) formation challenges to the delegation provision, *see Ahlstrom*, 21 F.4th at 635; (2) validity

2  and enforceability challenges to the delegation provision, *see Bielski*, 87 F.4th at 1009; and

3  (3) formation challenges to the underlying arbitration provision, *see Ahlstrom*, 21 F.4th at 635. But

4  if the delegation provision is valid, the court cannot consider validity or enforceability challenges

5  to the underlying arbitration provision. *See also Caremark, LLC v. Chickasaw Nation*, 43 F.4th

6  1021, 1030 (9th Cir. 2022) ("First, a court must resolve any challenge that an agreement to

7  arbitrate was never formed, even in the presence of a delegation clause. Next, a court must also

8  resolve any challenge directed specifically to the enforceability of the delegation clause before

9  compelling arbitration of any remaining gateway issues of arbitrability. Finally, if the parties did

10 form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to

11 the scope or enforceability of the arbitration provision are for the arbitrator to decide.").

12     Formation challenges to either a delegation provision or an underlying arbitration

13 provision are a matter of state law. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th

14 Cir. 2022) ("In determining whether the parties have agreed to arbitrate a particular dispute,

15 federal courts apply state-law principles of contract formation."). To challenge the validity or

16 enforceability of a delegation provision, "a party resisting arbitration must mention that it is

17 challenging the delegation provision and make specific arguments." *Bielski*, 87 F.4th at 1009. But

18 while challenges must be specific, they need not be unique: A party "may challenge the delegation

19 provision and the arbitration agreement for the same reasons, so long as the party specifies why

20 each reason renders the specific provision unenforceable." *Id.* at 1009–10.

21     If there is no delegation provision (or if one is successfully challenged), the Court must

22 resolve the gateway questions: whether the arbitration agreement was formed, whether there are

23 defenses or validity challenges to that agreement, and whether that agreement covers the dispute.

24     If the Court is "satisfied that the making of the agreement for arbitration … is not in issue"

25 it must "make an order directing the parties to proceed to arbitration." 9 U.S.C. § 4. The summary

26 judgment standard applies. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021).

27 The Court must "give to the opposing party the benefit of all reasonable doubts and inferences."

28 *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 963 (9th Cir. 2007).

### III. Analysis

#### A. The Shield Agreement Does Not Include or Incorporate a Delegation Clause.

The first question is whether the Shield Agreement actually includes a delegation provision as Nvidia contends. If so, the Court can only consider certain challenges. If not, the Court must decide whether the arbitration provision is valid and whether plaintiffs' claims are covered.

Because the question whether the parties' agreement incorporates a delegation clause is a matter of state contract law, the Court must determine at the outset what state's law governs. There is no choice of law provision in the Shield Agreement (the arbitration provision directs that disputes arbitrated according to the agreement be decided according to Delaware law but does not specify which law governs the agreement itself). Applying California choice of law rules, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), the Court concludes that California law governs the Shield Agreement because neither party has adequately invoked the law of another state, *see Hurtado v. Superior Ct.*, 11 Cal. 3d 574, 581 (1974).

The Shield Agreement does not include a delegation provision explicitly. It states only that NVIDIA customers with certain disputes agree to "submit the dispute to binding arbitration before an arbitrator from Judicial Mediation and Arbitration Services ('JAMS') located in Santa Clara County, California under the Optional Expedited Arbitration Procedures then in effect for JAMS."

The Shield Agreement also does not incorporate a delegation provision indirectly. "Under California law, parties may validly incorporate by reference into their contract the terms of another document," but the "reference to the incorporated document must be clear and unequivocal and the terms of the incorporated document must be known or easily available to the contracting parties." *Slaught v. Bencomo Roofing Co.*, 25 Cal. App. 4th 744, 748 (1994) (cleaned up). The Shield Agreement contains no such clear and unequivocal reference to any incorporated delegation provision.

Nvidia argues that the agreement "invokes" JAMS rules, and that those rules in turn "authorize the arbitrator to determine jurisdiction and arbitrability." Motion at 12. The Ninth Circuit has held that incorporating third-party arbitration rules that authorize the arbitrator to arbitrate arbitrability (i.e., a delegation provision) "constitutes clear and unmistakable evidence

that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). But in *Brennan*, the incorporation was *express*—the arbitration agreement at issue stated that claims "shall be settled by binding arbitration in accordance with the Rules of the American Arbitration Association." *Id.* at 1128. Here, by contrast, the Shield Agreement does *not* explicitly state which rules apply; it simply says that JAMS will be the arbitrator. And while the agreement states that the arbitration will proceed "under the Optional Expedited Arbitration Procedures then in effect for JAMS," these procedures (at least in their current version, which was adopted June 1, 2021) do not themselves include a delegation provision; they simply impose tight discovery and hearing deadlines and limits on discovery, briefing, and dispositive motions. *See JAMS Rule 16.2. Where Expedited Procedures Are Applicable*, perma.cc/TPJ2-3MSF.[1]

That the Shield Agreement does not incorporate a specific set of rules is made clear by the fact that even Nvidia appears unsure which rules apply. JAMS offers a "menu of rules" that allow its clients to "customize a process for [their] dispute." *See JAMS ADR Rules*, perma.cc/8G8U-V83G. Nvidia cites Rule 8(b) of the JAMS "Streamlined Arbitration Rules" as the source of the purported delegation clause. *See* Motion at 12. But the Shield Agreement nowhere says that the Streamlined Rules apply. To the contrary, the "Optional Expedited Arbitration Procedures" referenced in the agreement appears only in JAMS' "Comprehensive Arbitration Rules." Resolving unclarity over which rules might apply to disputes subject to the Shield Agreement's arbitration provision is a problem for the arbitrator. But the existence of this ambiguity highlights the Shield Agreement's failure to incorporate one particular set of rules—a drafting decision which means that the agreement does not delegate questions of arbitrability to the arbitrator.

Of course, there may be valid reasons not to incorporate a specific set of arbitration rules. The JAMS rules themselves envision that parties may want to agree to JAMS arbitration without specifying in advance which rules will apply. The JAMS rules currently in effect distinguish between different kinds of disputes, with the comprehensive rules applying by default (i.e. "in the

---

[1] The Court takes judicial notice of the JAMS website and the various sets of rules linked therein under Federal Rule of Evidence 201 because the content of the website "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

1    absence" of an agreement to use specific rules) to claims that exceed $250,000 and the streamlined

2    rules applying by default to claims that do not. Moreover, as the "then in effect" language from the

3    Shield Agreement suggests, rules may evolve over time, and a party drafting an arbitration

4    provision may want to maintain flexibility by requiring arbitration but allowing whatever current

5    rules are in effect for the specific claim at issue to apply. But the flipside of that flexibility is that

6    an arbitration clause that does not select a specific set of rules cannot be said to incorporate those

7    unidentified rules (and any delegation provisions therein) into the arbitration agreement itself.

Because the parties' arbitration agreement does not incorporate a delegation clause, the Court rather than the arbitrator must decide the threshold questions of arbitrability.

### B. The Shield Agreement's Arbitration Provision Is Not Unconscionable.

Because there is no delegation provision, the Court must consider any defenses plaintiffs raise to the validity or enforceability of the Shield Agreement's arbitration provision. Plaintiffs argue that the arbitration provision is unconscionable and therefore cannot be enforced. Under California law, which governs this dispute for the reasons discussed above, plaintiffs must show both procedural and substantive unconscionability:

> Unconscionability consists of both procedural and substantive elements. The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided. A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be "so one-sided as to shock the conscience. …
>
> Both procedural unconscionability and substantive unconscionability must be shown, but they need not be present in the same degree and are evaluated on a sliding scale. The more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.

*Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 246–47 (2012) (cleaned up). Here, while plaintiffs' procedural unconscionability arguments have merit, they have not shown the sort of substantive unconscionability that would make the agreement unenforceable.

7

### 1. Procedural Unconscionability

Plaintiffs argue that the Shield Agreement's arbitration provision is procedurally unconscionable (1) because it is a contract of adhesion, (2) because users are not notified that the agreement exists until after they start using Shield devices, and (3) because it would likely surprise a consumer. Under California law, "procedural unconscionability requires oppression or surprise. Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form." *Pinnacle*, 55 Cal. 4th at 247 (cleaned up). Taken together, the circumstances plaintiffs have identified here demonstrate significant procedural unconscionability.

First, the Shield Agreement and its arbitration provision are clearly adhesive: Plaintiffs could either accept the terms and use their devices, or reject them and forgo use. The provision does not provide any mechanism to opt-out. Such "take-it-or-leave-it adhesion contracts always contain 'some degree of procedural unconscionability.'" *Bielski*, 87 F.4th at 1014 (quoting *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 915 (2015)).

Next, plaintiffs assert (and Nvidia does not contest) that there was no way for them to review the terms of the Shield Agreement until after they had purchased their devices, opened them, turned them on, and begun the setup process. Opposition, Dkt. No. 34, at 10. This circumstance renders the agreement even more oppressive than a take-it-or-leave it contract of adhesion that a customer at least has a chance to review before deciding whether to make a purchase. As one California appellate court has summarized, "oppression" can refer to "an absence of power to negotiate the terms of a contract" (i.e. adhesion), as well as "the absence of reasonable market alternatives." *See Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1319–20 (2005). When faced with an adhesive contract and no market alternatives, "the weaker party lacks not only the opportunity to bargain but also any realistic opportunity to look elsewhere for a more favorable contract; he must either adhere to the standardized agreement or forego the needed service." *Id.* at 1320 (cleaned up). But "if the complaining party has a meaningful choice of reasonably available alternative sources of supply from which to obtain the desired goods and services free of the terms claimed to be unconscionable," then "the 'oppression' factor of the

procedural element of unconscionability may be defeated" even if the contract is adhesive. *Id.* (cleaned up). Here, by not presenting the terms of the Shield Agreement until after a customer had already made a purchase, Nvidia deprived its customers of the chance to consider market alternatives before making a purchase that required agreeing to an adhesive arbitration provision.

Nvidia argues that it is "contrary to law and the realities of modern commerce to find a contract to be unconscionable unless consumers can preview and negotiate terms pre-purchase." But the cases it cites do not support its argument. In *LeBoeuf v. NVIDIA Corp.*, the court determined that the delegation provision at issue was *not* actually a contract of adhesion because, unlike here, it allowed consumers to opt out. No. 19-CV-02543-SVK, 2019 WL 13210428, at *10 (N.D. Cal. Nov. 18, 2019). And the court concluded that there was no procedural unconscionability because the plaintiffs were given two opportunities to review the contested delegation provision during the process of downloading and installing the software at issue. *Id.* In *Herron v. Best Buy Stores, L.P.*, the court considered the fact that the customer was not provided the disputed arbitration provision until after purchasing a laptop in the context of formation rather than unconscionability. No. 12-CV-02103, 2014 WL 2462973, at *1 (E.D. Cal. June 2, 2014). Issues of formation are distinct from questions of unconscionability; a party might accept a contract even where the procedures are unfair. And in *Herron*, the court did not consider unconscionability challenges to the arbitration provision because it concluded that those questions had been delegated to the arbitrator. *Id.* Nvidia's arguments are also contrary to common sense: If anything, the "realities of modern commerce" make it *easier* for merchants to allow customers to preview terms before purchases. Here, for example, the parties do not dispute that Nvidia posted other software license agreements on its website. *See* Opposition at 6; Reply, Dkt. No. 39, at 5.

Finally, plaintiffs argue that the arbitration provision in the agreement itself would likely surprise consumers. These arguments are weaker. Surprise is not established simply because the arbitration provision is located near the end of the contract. *See id.* The text of the arbitration provision appears under the heading "Governing Law and Dispute Resolution." Dkt. No. 21-1, at 3–4. The clause is written in straightforward language and appears in the same font and size as the rest of the agreement. *Id.* The California Supreme Court recently found surprise when an

arbitration provision formed a "single dense paragraph covering … 51 lines" "written in an extremely small font" that is "visually impenetrable and challenges the limits of legibility," with "opaque" and "complex" sentences filled with "statutory references and legal jargon." *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 128 (2019). The Shield Agreement's arbitration provision is clearer and there is therefore no basis for finding surprise.

In sum, even though the presentation of the arbitration provision in the text of the Shield Agreement itself does not render the provision surprising, the procedures by which Shield users were required to enter into this adhesive agreement after already having purchased and started using the product were oppressive. This renders the provision procedurally unconscionable.

### 2. Substantive Unconscionability

Plaintiffs next argue that the arbitration provision is substantively unconscionable (1) because it lacks bilaterality, (2) because it requires certain steps before commencing arbitration, (3) because it requires plaintiffs to pay a portion of the arbitration fees, and (4) because it requires arbitration in Santa Clara County.

First, plaintiffs argue the arbitration provision lacks bilaterality. But the California Supreme Court has explained that an agreement "can provide a 'margin of safety' that provides the party with superior bargaining strength a type of extra protection … without being unconscionable." *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1250 (2016). Because "a one-sided contract is not necessarily unconscionable, something more than the absence of mutuality is required … to find the [a] provision unconscionable." *Bielski*, 87 F.4th at 1015.

Second, plaintiffs argue that the arbitration provision's requirement that users "jump through multiple, antecedent hoops before initiating arbitration" renders it substantively unconscionable. Opposition at 12. In making this argument, however, plaintiffs rely heavily on the district court opinion that was subsequently reversed by the Ninth Circuit in *Bielski*. There, the Ninth Circuit held that the pre-arbitration dispute resolution procedures at issue were "clearly presented" and "not onerous or beyond the reasonable expectation of the user." *Bielski*, 87 F.4th at 1014. The court concluded that such pre-arbitration procedures "are commonplace and can be both 'reasonable and laudable.'" *Id.* (quoting *Serpa v. Cal. Sur. Investigations, Inc.*, 215 Cal. App. 4th

1  695 (2013)). The same is true here. The Shield Agreement only requires a single straightforward

2  step before arbitration: Users must "contact NVIDIA by U.S. Mail" to first give the company "a

3  chance to resolve" any complaints. Dkt. No. 21-1, at 3–4. This is hardly the kind of onerous hoop

4  jumping that would render the pre-arbitration procedures a substantively unconscionable

5  roadblock to relief. Here, as in *Bielski*, the "lack of mutuality… combined with [a] pre-arbitration

6  dispute resolution process" is not enough to render the agreement unenforceable. *See* 87 F.4th at

7  1015.[2]

8        Third, plaintiffs argue that the JAMS rules' requirement that each party pay its pro rata

9  share of fees and expenses impermissibly requires them to bear an expense they would not be

10 required to bear in federal court. Opposition at 12. As Nvidia points out, though, the JAMS fee

11 schedule specifies that in "matters involving consumers, the consumer is only required to pay

12 $250." Reply, Dkt. No. 39, at 6. That is less than this Court's $405 filing fee for civil cases. *See*

13 Court Fee Schedule Summary, N.D. Cal., perma.cc/DP59-33DR. A fee requirement that is not just

14 comparable to but actually below this Court's does not render the agreement unduly harsh.

15       Finally, plaintiffs briefly argue that the requirement that arbitration be conducted in Santa

16 Clara County is substantively unconscionable because the location is "considerably more

17 advantageous" to Nvidia. Opposition at 13. Nvidia counters that the agreement only requires that

18 the arbitrator be located in Santa Clara County but does not require that the arbitration occur *in-*

19 *person* at that location. *Id.* This location requirement imposes no additional unfairness where, as

20 here, the alternative to arbitration that plaintiffs seek is litigation in federal court in Santa Clara

21 County.

---

[2] The degree of substantive unconscionability created by such terms is, of course, context-dependent. Because employers often pursue claims against employees, an agreement requiring employees to arbitrate their claims against the employer but exempting the employer's claims from arbitration often demonstrates a substantial degree of substantive unconscionability. *See, e.g.*, *Nyulassy v. Lockheed Martin Corp.*, 120 Cal. App. 4th 1267, 1282 (2004). For the same reason, requiring that informal dispute resolution procedures be pursued before arbitration can raise significant unfairness concerns. *Id.* at 1282–83 (noting that such provisions provide the employer with a "free peek" at the employee's case). The circumstances here are different: It is difficult to imagine what claims regarding the Shield license or software Nvidia might pursue against consumers who purchase the Shield.

The Shield Agreement is procedurally unconscionable for the reasons discussed above. But "a finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract." *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 915 (2015) (cleaned up). And a "term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be so one-sided as to shock the conscience." *Pinnacle*, 55 Cal. 4th at 246. Here, Shield Agreement's terms—including the unilateral arbitration requirement, the pre-arbitration procedures, the fee provisions, and the forum selection—are not so one-sided as to render the agreement conscience-shocking and substantively unconscionable. Because unconscionability requires both procedural and substantive unfairness, plaintiffs have failed to establish that the arbitration agreement is unenforceable.

### C. The Shield Agreement's Arbitration Provision Covers Plaintiffs' Claims.

Having concluded that the Shield Agreement's arbitration provision is enforceable, the final question is whether it covers plaintiffs' claims. The provision states: "If you have any complaint about this license or the SOFTWARE ["software, firmware, content, applications, documentation and any data that is delivered … for use in a NVIDIA SHIELD device"] you agree to … submit the dispute to binding arbitration." The agreement includes an exception for a party "seeking injunctive or equitable relief from … courts … to protect data security, intellectual property rights, or other proprietary rights." Dkt. No. 21-1, at 4. Plaintiffs' claims do not fall within this exception, and the remaining language of the Agreement sweeps broadly. Indeed, plaintiffs do not dispute that their claims are covered by the arbitration agreement if it can be enforced. Upon review, all five of plaintiffs' claims are "complaint[s]" covered by the Shield Agreement's arbitration provision and must therefore be resolved in arbitration.

### D. This Action Will Be Stayed Until July 1, 2024

The Court recently explained in another case:

> Section 4 of the FAA directs that, in a suit involving claims subject to an arbitration agreement, the Court "shall on application ... stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." The Ninth Circuit, however, has carved out an exception to this language, concluding that "[n]otwithstanding the language of section three, a district court may

12

> either stay the action or dismiss it outright when ... the court determines that all of the claims raised in the action are subject to arbitration." *Forrest v. Spizzirri*, 62 F.4th 1201, 1204–05 (9th Cir. 2023) (cleaned up).… Recently, … the Supreme Court granted the petition for certiorari in *Forrest* in order to decide whether the FAA allows district courts to dismiss a case when all claims are subject to arbitration or whether the suit must be stayed.

*Rossi v. Purvis*, No. 23-CV-04148-PCP, __ F. Supp. 3d __, 2024 WL 319679, at *9–10 (N.D. Cal. Jan. 29, 2024). As in *Rossi*, the circumstances in this case would justify dismissing plaintiffs' complaint outright under the exception discussed in *Forrest*, but given the possibility of a change in this area of the law, the Court will instead stay this case until July 1, 2024. Absent new authority precluding dismissal, this case will be dismissed on that date. If the Supreme Court holds that dismissal is not permissible, the stay will remain in place until arbitration is complete.

**IV.   Conclusion**

Nvidia's motion is granted. This action shall be stayed until July 1, 2024.

**IT IS SO ORDERED.**

Dated: February 28, 2024

_____
P. Casey Pitts
United States District Judge